UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW HAMPSHIRE

Hilary Murungi Timbigamba

     v.

FCI Berlin, Warden et al

Civil No. 26-cv-281-LM-AJ
Opinion No. 2026 DNH 060 P

**O R D E R**

Petitioner Hilary Murungi Timbigamba filed a petition under 28 U.S.C. § 2241 asserting that his civil immigration detention is unlawful in the absence of an individualized hearing at which the government is required to prove that he poses a danger to the community or a flight risk if released. This court granted Timbigamba's petition and ordered respondents to provide him with a constitutionally adequate bond hearing before an Immigration Judge (IJ). A bond hearing was held, but the IJ denied release, finding that Timbigamba is both dangerous and a flight risk.

Presently before the court is Timbigamba's motion to enforce this court's order granting his habeas petition. Timbigamba contends that the bond hearing provided was constitutionally inadequate because the evidence presented at his hearing was insufficient as a matter of law to establish dangerousness or flight risk. Respondents object. For the following reasons, Timbigamba's motion (doc. no. 8) is granted.

## BACKGROUND[1]

Timbigamba is a 34-year-old Ugandan national. He unlawfully entered the United States in April 2022. An asylum officer determined that Timbigamba showed a credible fear of persecution or torture if returned to Uganda. See 8 U.S.C. § 1225(b)(1)(B). Officials thereafter released Timbigamba on humanitarian parole under 8 U.S.C. § 1182(d)(5)(A) and issued him a Notice to Appear in removal proceedings under 8 U.S.C. § 1229a. The Notice to Appear charged Timbigamba with inadmissibility under 8 U.S.C. § 1182(a)(6)(A) and (7).

Since his entry into the United States, Timbigamba has purchased a home in Athol, Massachusetts. He has an active mortgage on that property, which he is current on. He also enrolled in a master's degree program in Counseling Psychology at Framingham State University and obtained a tuition waiver. In addition, Timbigamba became an active member of the Church of Jesus Christ of Latter-day Saints in Marlborough, Massachusetts, where he routinely teaches Sunday School classes and speaks at church services. Until February 2025, Timbigamba worked as a Program Manager at a group home for intellectually disabled adults operated by

---

[1] The following facts are drawn from materials available to the IJ at the time of the bond hearing. They are recited in the light most favorable to the IJ's decision. See Acero v. FCI Berlin, Acting Warden, --- F. Supp. 3d ----, ----, 2026 WL 821896, at *1 n.1 (D.N.H. 2026); cf. United States v. Torres Monje, 989 F.3d 25, 27 (1st Cir. 2021) (explaining that, on a challenge to the legal sufficiency of the evidence to support a criminal conviction, the court reviews the evidence in the light most favorable to the verdict).

Advocates, Inc. [2] As a Program Manager, he oversaw the home's day-to-day operations and was responsible for updating residents' treatment plans.

In May 2025, Advocates' Director of Corporate Risk Management reported to the Framingham Police Department that he suspected Timbigamba had been stealing from one of the homes' residents. According to the Director, Advocates is the representative payee for the resident, which means that the resident's social security checks are direct deposited into Advocates' bank account. The Director explained that, when Advocates acts as a resident's representative payee, the resident can request funds from Advocates for things like groceries or to pay bills. If sufficient funds are available in the resident's account and if the Finance Department approves the proposed expenditure, the funds are disbursed to the resident in the form of a check paid to the order of the resident. Once the check is ready, it is placed at the front desk of Advocates' corporate office, at which time the Program Manager of the resident's home, or the resident himself, can pick up the check. The Director further explained that Advocates maintains a "Check Pickup Log," which shows the date each check is picked up, the name on the check, the name of the person picking up the check, the amount of the check, the check number, and the program or residence of the resident.

The Director stated that an internal review at Advocates uncovered that seven checks that were intended to be paid to a particular resident at Timbigamba's

---

[2] Advocates terminated Timbigamba's employment in February 2025 for reasons that are not apparent, but which were unrelated to the alleged misconduct that formed the basis for his criminal charges.

group home were signed on the back with the resident's name and "pay to the order of Hillary [sic] Timbigamba." Doc. no. 8-4 at 8. The checks were distributed between March and December 2024, and each check reflected on its backside that it was deposited at a Digital Credit Union (DCU) branch. The Director said that the resident to whom the checks pertained never received any of the funds from them, which totaled $5,750. Finally, the Director claimed there was approximately $4,000 in cash withdrawals from the resident's own bank account with Santander bank that the Director "considered to be suspicious," but that he had no evidence linking Timbigamba to these withdrawals. Id. at 9.

Detective Sean Wilson thereafter opened an investigation. He learned from Advocates' staff that the resident in question has severe mental illness and is unable to responsibly pay monthly bills on his own. As Program Manager, Timbigamba was responsible for overseeing the resident's finances and assisting him with paying his bills and purchasing any necessities or other items that the resident wanted to buy. Detective Wilson learned from the Check Pickup Log that Timbigamba had picked up each of the checks in question, and that each was deposited into a DCU account held by Timbigamba. Those funds were then either withdrawn from the account or transferred to another DCU account held by Timbigamba. However, Detective Wilson did not obtain any additional information regarding who had made the withdrawals from the resident's Santander bank account. He did learn that the account started to have a negative balance in

4

November 2024 after the account began to receive return payments on reoccurring bills for insufficient funds.

Based on the foregoing investigation, Detective Wilson obtained an arrest warrant and charged Timbigamba via complaint with one count of larceny over $1200 by a single scheme and one count of larceny over $250 from a disabled person, both of which are felonies under Massachusetts law. Timbigamba was arrested and appeared in Massachusetts state court for an arraignment and bail hearing on July 11, 2025. The judge ordered Timbigamba released on personal recognizance. However, the Department of Homeland Security, Immigration and Customs Enforcement (ICE) took Timbigamba into custody as he was leaving the courthouse.

Timbigamba was supposed to have a pretrial hearing on these criminal charges on August 25, 2025. According to Timbigamba, ICE refused to arrange for his transportation to this hearing and declined to facilitate his remote appearance. The state court therefore issued a bench warrant and entered a default. No hearings are currently scheduled in Timbigamba's criminal matter, and his charges remain pending.

In November 2025, Timbigamba requested a bond hearing before an IJ. The IJ concluded that Timbigamba's request was governed by 8 U.S.C. § 1226, but that the pending larceny charges rendered his detention mandatory under § 1226(c). See 8 U.S.C. § 1226(c)(1)(E) (mandating detention for noncitizens who are inadmissible

under 8 U.S.C. § 1182(a)(6)(A) or (7) and "charged with" or "arrested for," inter alia, larceny). That same month, an IJ ordered Timbigamba removed.

Timbigamba filed a habeas petition in this court on April 9, 2026. Among other things, he claimed that his detention without a bond hearing violated his due process rights. The government's response acknowledged that, if the court applied Judge Elliott's reasoning in Destino v. FCI Berlin, Warden, Civ. No. 25-cv-374-SE-AJ, 2025 WL 4010424 (D.N.H. Dec. 24, 2025), the court "would order that [Timbigamba] be afforded a bond hearing before an immigration judge" as a matter of due process. Doc. no. 5 at 2. On April 14, 2026, this court issued an endorsed order finding that Timbigamba "is entitled to a bond hearing as a matter of due process" and ordered respondents to provide him with "a constitutionally adequate bond hearing before an IJ within 7 days." Endorsed Order of Apr. 14, 2026. The court specified that, because detention without a bond hearing would violate Timbigamba's constitutional rights, "the IJ shall have authority to consider [Timbigamba's] release regardless of whether he is subject to mandatory detention as a statutory matter." Id.

At the bond hearing, Timbigamba submitted sworn declarations from himself and another Advocates employee, Kimberly Welsch. In his declaration, Timbigamba attested that the resident whose funds he was accused of misappropriating has serious mental illnesses and that the resident's "treating physicians specifically instructed that he should not handle money directly" and "should not be given direct access to cash or expected to conduct financial transactions himself." Doc. no.

6

8-3 at 6. He also attested that Advocates uses a "receipt accountability requirement," pursuant to which he was required to submit physical receipts to Advocates "documenting exactly how the funds from the prior check had been spent" before another could be issued. Id. at 7. According to Timbigamba, Advocates would not even accept electronic copies in lieu of the originals, and he would "submit[ ] receipts exclusively in person . . . because the physical copies were required in all cases." Id. Timbigamba explained that this was "a mandatory part of Advocates' fiduciary controls" and that "[n]o new funds would be released until the prior [check] was fully accounted for." Id.

Timbigamba stated that, "for each of the seven checks at issue . . . [he] submitted receipts to Advocates' Finance Department documenting the purchases [he] made on [the resident's] behalf before the next check was approved and issued." Id. He also said that, because of the recommendations of the resident's treating physicians—and given the reality of the resident's condition, which was such that he "could not be expected to conduct financial transactions on his own"—"it was part of the normal course of [Timbigamba's] duties as Program Manager that checks issued to [this resident] would be endorsed by [the resident] and made payable to" Timbigamba. Id. at 7-8. Timbigamba would "then deposit or cash the checks and use the funds to purchase the items [the resident] needed or requested." Id. at 8. He further asserted that "[t]his practice was not unauthorized or unusual," but was instead "the mechanism by which the system was designed to operate for residents like [this one] who, on their physicians' instructions, could not handle money." Id.

7

Timbigamba underscored that "[t]he endorsed checks were used for [the resident's] benefit, and [he] accounted for every expenditure through the receipt submission process described above." Id. Finally, Timbigamba represented that the recurring debits to the resident's Santander bank account "were standing check requests or automatic payments that predated and were independent of [his] involvement." Id.

Welsch's declaration corroborated Timbigamba's description of Advocates' receipt requirement. Welsch attested that, for any check exceeding $100, the staff member who picked up the resident's check "was required to submit physical receipts . . . documenting how the funds had been spent . . . as soon as possible." Id. at 11-12. If receipts were not timely submitted, Welsch said that Advocates would follow up with the relevant staff member. This was "a fundamental part of Advocates' fiduciary controls" and "it would be extremely difficult for a staff member to misappropriate client funds over an extended period" because, "[i]f a staff member picked up a check and did not return receipts demonstrating that the funds were spent on the client's behalf, . . . no subsequent check should have been issued until the prior expenditure was documented." Id. at 12. Based on Welsch's ten years of experience at Advocates, the organization "actively tracked and followed up on outstanding receipts," and did not consider the receipt accountability requirement "a minor administrative detail." Id. at 12-13. Welsch also explained that Advocates had a separate system for recurring monthly expenses, which did not require approvals or disbursements of funds on an ad hoc basis. Instead, for regular, fixed expenses (like rent for residing in a group home), payments would be

8

automatically processed each month in the same amount and on the same date.

"Accordingly," said Welsch, "a Program Manager's financial responsibilities for a

client would typically be limited to the client's personal, day-to-day expenses." Id. at

12.

At the bond hearing, Timbigamba argued that ICE refused to transport him

or otherwise facilitate his remote appearance at hearings on these larceny charges,

only to then rely on his pending charges as justification for his immigration

detention.[3] He contended that ICE should not be permitted to prevent him from

resolving criminal charges and then justify his immigration detention based on the

pendency of those charges.

Timbigamba also presented evidence of his home ownership in

Massachusetts, his enrollment in a master's degree program at Framingham State

University, and a letter of support from his church affirming his substantial

involvement in church activities and his positive reputation amongst churchgoers.

In addition, Timbigamba submitted a declaration from a U.S.-citizen bond sponsor

who attested to a longstanding relationship with Timbigamba and his family, and

who pledged to ensure that Timbigamba complied with all release conditions.

---

[3] The government submitted an audio recording of the bond hearing per this court's request. See Endorsed Order of May 11, 2026. The court has listened to the audio file. DHS policies provide that an IJ's bond decision is "[u]sually" rendered orally and that a written memorandum of decision is only prepared if one of the parties appeals the decision to the Board of Immigration Appeals. EOIR Policy Manual, Pt. II, Ch. 8, § 8.3(e)(7), available at https://www.justice.gov/eoir/policy-manual-eoir/part-II/icpm/chapter-8-3. As of the time of this order's issuance, no written transcript of the bond hearing was available. Timbigamba attempted to attach an unofficial transcript to his motion, but it is illegible. Doc. no. 8-6.

At the bond hearing, the government did not respond to Timbigamba's evidence regarding Advocates' receipt requirement or to Timbigamba's testimony that he complied with that requirement. While the government did present police reports summarizing the Risk Management Director's allegations and Detective Wilson's subsequent investigation, omitted from those reports is any mention of Advocates' receipt requirement, and there is no indication in the reports that the Director or Detective investigated whether Timbigamba submitted receipts for the checks in question. Nor did the government address Timbigamba's assertion that ICE had unreasonably failed to facilitate resolution of the criminal charges it was relying upon to justify his detention. Instead, the government argued only that those pending charges established Timbigamba's dangerousness by clear and convincing evidence, and that the non-final removal order established his flight risk by a preponderance of the evidence.[4]

The IJ adopted the government's contentions. While stating that she "reviewed the record carefully and considered all parties'" arguments, the IJ found that the government showed Timbigamba to be a danger to the community by clear and convincing evidence because he "is currently under investigation for larceny." Though she acknowledged that Timbigamba had not been convicted, the IJ stated that she had "reviewed the records with regard to these checks" and believed that the record provided a sufficient basis to find dangerousness by clear and convincing

---

[4] While the government also stated that Timbigamba had an "open warrant," it neglected to note that issuance of the August 2025 bench warrant was due to ICE's failure to transport him to the pretrial hearing in his criminal proceeding.

evidence. She did not otherwise explain the basis for her dangerousness finding. "In the alternative," the IJ ruled, the government proved flight risk by a preponderance of the evidence that no amount of bond could ameliorate. The IJ stated that Timbigamba was subject to a non-final order of removal and that he did "not seem to have any viable path to relief from removal." She also stated that he had only come to the United States "relatively recently" in 2022 and "has limited ties to the community." Although the IJ said she considered Timbigamba's membership in his religious community, his home ownership, and his educational pursuits, she ultimately concluded that, "given that he simply seems to have no viable avenue to relief and he's already been ordered removed," his release presented "a very significant flight risk" that no amount of bond or conditions of release could ameliorate. The hearing lasted approximately eleven minutes.

## DISCUSSION

I.    Background

A noncitizen who is "in the country" may be detained during the pendency of removal proceedings pursuant to 8 U.S.C. § 1226. Jennings v. Rodriguez, 583 U.S. 281, 289 (2018). Generally speaking, DHS has the authority to release noncitizens facing removal proceedings on "bond of at least $1,500" or "conditional parole." 8 U.S.C. § 1226(a).[5] Section 1226(c) eliminates DHS's discretion to release certain

---

[5] An ICE officer "makes the initial detention determination" under § 1226(a). Hernandez-Lara v. Lyons, 10 F.4th 19, 26 (1st Cir. 2021). Regulations provide that, if the noncitizen disagrees with the officer's decision, he may appeal it to an IJ, who may then "exercise the authority" in § 1226(a) to detain or release the noncitizen. 8 C.F.R. § 236.1(d)(1).

categories of "criminal" noncitizens. Id. § 1226(c). As relevant to this case, DHS is statutorily required to detain noncitizens charged with specified offenses (one of which is larceny) who are inadmissible under 8 U.S.C. § 1182(a)(6)(A) or (7). 8 U.S.C. § 1226(c)(1)(E). Here, Timbigamba has been ordered removed pursuant to a Notice to Appear that charges him with being inadmissible under § 1182(a)(6)(A) and (7), and he faces pending larceny charges.

While § 1226(c) may eliminate DHS's statutory discretion to consider Timbigamba's release, this court and others have recognized that noncitizens with sufficient ties to the United States have a due process right not to be subjected to civil immigration detention unless the government proves at an individualized hearing that the noncitizen is dangerous or a flight risk. Destino, 2025 WL 4010424, at *9.[6] In other words, some noncitizens have a due process right to a bond hearing regardless of whether their detention is mandated by statute. Id. at *7. In this case,

---

[6] In Demore v. Kim, 538 U.S. 510, 528-31 (2003), the Supreme Court held that § 1226(c)'s mandatory-detention requirement did not violate due process. However, at the time Demore was decided, § 1226(c) only applied to noncitizens "who had already been convicted (beyond a reasonable doubt) of committing certain serious crimes." Hernandez-Lara, 10 F.4th at 35. Demore highlighted that, in enacting the version of § 1226(c) then-under consideration, Congress had evidence before it that permitting the discretionary release of noncitizens convicted of serious crimes would lead to a substantial number of those noncitizens reoffending, failing to appear for removal proceedings, and unlawfully remaining in the United States. 538 U.S. at 518-20. Congress expanded § 1226(c)'s mandatory detention regime in 2025 to include noncitizens who are "charged with" or "arrested for" certain nonviolent theft offenses, even if they have not yet been "convicted of" those offenses. Laken Riley Act, Pub. L. No. 119-1, § 2, 139 Stat. 3, 3 (2025). The Supreme Court has not yet addressed the constitutionality of denying bond hearings to noncitizens with significant ties to the United States who are merely charged with nonviolent theft offenses. See Alcantara Guerrero v. Wesling, --- F. Supp. 3d ----, ----, 2026 WL 931503, at *4 (D. Mass. 2026).

12

the government has taken the position that, while Timbigamba's pending charges bring him within the ambit of § 1226(c), he is nevertheless entitled to a bond hearing as a matter of due process if this court applies Judge Elliott's reasoning in Destino. Doc. no. 5 at 2-3; see also Destino, 2025 WL 4010424, at *11 (holding that noncitizens with established ties to the United States who have been paroled into the country have a "particularly strong" liberty interest in remaining free that cannot be revoked without process).

Because the undersigned finds Destino's analysis persuasive and in light of the parties' positions, this court granted Timbigamba's habeas petition on the ground that his detention in the absence of a bond hearing violated his due process rights. See Endorsed Order of Apr. 14, 2026. The court ordered respondents "to provide [Timbigamba] with a constitutionally adequate bond hearing before an IJ within 7 days" and made clear that, "[b]ecause [Timbigamba] is entitled to a bond hearing as a matter of due process, the IJ shall have authority to consider [his] release regardless of whether he is subject to mandatory detention as a statutory matter." Id. A bond hearing was held on April 22, but as noted, the IJ denied release. Timbigamba now moves to enforce this court's April 14 order, contending that his bond hearing was constitutionally inadequate because the evidence submitted was insufficient as a matter of law to find dangerousness or flight risk.

Where a court sitting in habeas has ordered a bond hearing to remedy otherwise unconstitutional detention, the court retains authority to ensure that the

13

bond hearing provided passes constitutional muster.[7] E.g., Massingue v. Streeter, No. 3:19-cv-30159-KAR, 2020 WL 1866255, at *3-4 (D. Mass. Apr. 14, 2020). In Hernandez-Lara v. Lyons, 10 F.4th 19, 41 (1st Cir. 2021), the First Circuit held that, in order to detain a noncitizen under § 1226(a), "due process requires the government to either (1) prove by clear and convincing evidence that [the noncitizen] poses a danger to the community or (2) prove by a preponderance of the evidence that [the noncitizen] poses a flight risk." While the Circuit's holding was technically concerned with bond hearings afforded under § 1226(a), this court discerns no reason that the Circuit's analysis regarding the constitutionally requisite burden of proof would not also apply to bond hearings ordered as a matter

---

[7] In opposing Timbigamba's motion to enforce, respondents have not argued that this court lacks jurisdiction over Timbigamba's sufficiency-of-the-evidence claim pursuant to 8 U.S.C. § 1226(e). Even if they had so argued, § 1226(e) only bars judicial review of the IJ's "discretionary judgment regarding the application of this section." 8 U.S.C. § 1226(e) (emphasis added). Timbigamba's bond hearing was compelled by the constitution and not § 1226; therefore, the IJ's bond determination did not involve "application of" § 1226. Id. In any event, and as this court has repeatedly held, § 1226(e) does not deprive courts of "jurisdiction to review an Immigration Judge's discretionary bond denial . . . where that bond denial is challenged as legally erroneous or unconstitutional." Mayancela Mayancela v. FCI Berlin, Warden, Civ. No. 25-cv-348-LM-TSM, 2025 WL 3215638, at *4 (D.N.H. Nov. 18, 2025) (brackets omitted) (quoting Diaz-Calderon v. Barr, 535 F. Supp. 3d 669, 676 (E.D. Mich. 2020)); accord Lokombe v. Wesling, Civ. No. 26-cv-253-JL-TSM, 2026 WL 1270814, at *2 (D.N.H. May 8, 2026) (Laplante, J.); Flores v. Brackett, Civ. No. 26-cv-94-PB-TSM, 2026 WL 1179959, at *2 (D.N.H. Apr. 30, 2026) (Barbadoro, J.); see also Zheng v. Rokosky, --- F. Supp. 3d ----, ----, 2026 WL 800203, at *3 (D.N.J. 2026) ("[W]hile this Court does not have jurisdiction to review the IJ's discretionary decision to grant or deny bond, it may review whether a bond hearing was fundamentally unfair and thus violated the Due Process Clause of the Fifth Amendment."). Because Timbigamba claims that his bond hearing was constitutionally inadequate, this court has jurisdiction to assess his claim even if review of this bond hearing is constrained by § 1226(e).

of due process. The government does not dispute that, in order to detain Timbigamba, it needed to establish at the bond hearing that he poses a danger by clear and convincing evidence or a flight risk by a preponderance of the evidence. The court's analysis therefore proceeds from the assumption that the burden of proof articulated in Hernandez-Lara governed Timbigamba's bond hearing.

To obtain relief on the instant motion, Timbigamba must demonstrate that the IJ "failed to place the burden of proof on the Government" to either show dangerousness by clear and convincing evidence or flight risk by a preponderance of the evidence. Diaz Ortiz v. Smith, 384 F. Supp. 3d 140, 143 (D. Mass. 2019). One way to make this showing is by establishing that the evidence before the IJ was such that no reasonable IJ could have concluded that the government met its burden of demonstrating dangerousness or flight risk to the requisite degree of certainty. Mayancela Mayancela, 2025 WL 3215638, at *5-6. Timbigamba contends that the evidence was insufficient on both scores.[8] The court first turns to evidence of dangerousness, before assessing the flight-risk evidence.

---

[8] Respondents contend that Timbigamba is required to exhaust his arguments in an appeal to the BIA before this court may consider them. Even assuming a common-law exhaustion requirement applies, the court excuses it because Timbigamba has already been detained for over ten months and the BIA likely lacks jurisdiction to review whether the IJ's findings comported with Timbigamba's due process rights or this court's habeas order. See Williams v. Warden, FCI Berlin, 793 F. Supp. 3d 412, 422 (D.N.H. 2025); Ribeiro-Almeida v. FCI Berlin, Warden, 811 F. Supp. 3d 245, 248 (D.N.H. 2025).

15

II.    The Evidence Was Legally Insufficient to Establish Timbigamba's
       Dangerousness

Beginning with dangerousness, the First Circuit has recognized that "[t]he clear and convincing standard is a demanding standard to satisfy."[9] United States v. Anonymous Appellant, 85 F.4th 576, 580 (1st Cir. 2023). To establish a noncitizen's dangerousness by clear and convincing evidence, the government must show that it is "highly probable" or "reasonably certain" that the noncitizen is dangerous. Díaz-Alarcón v. Flández-Marcel, 944 F.3d 303, 306 n.5 (1st Cir. 2019) (first quoting Colorado v. New Mexico, 467 U.S. 310, 316 (1984), and then quoting Evidence: Clear and Convincing Evidence, Black's Law Dictionary (10th ed. 2014)).

In this case, the government's attempt to meet its burden to establish Timbigamba's dangerousness rested entirely on the pendency of his larceny charges and on the police reports underlying those charges. However, the record makes clear that Timbigamba had exculpatory evidence to rebut these charges.[10] And he alleges that ICE did not transport him to court so that he could be exonerated. Although a sufficiency-of-the-evidence analysis affords significant deference to the

---

[9] Application of the clear-and-convincing standard "reflects the value society places on" the private interest sought to be deprived, and applies, among other things, to governmental efforts "to terminate parental rights, deport a noncitizen, or denaturalize an individual." Hernandez-Lara, 10 F.4th at 39-40 (citations omitted) (quoting Addington v. Texas, 441 U.S. 418, 425 (1979)).

[10] In conducting sufficiency-of-the-evidence review, the court reviews "the entire record," including the evidence submitted in rebuttal to the party bearing the burden of proof. United States v. Teleguz, 492 F.3d 80, 86 (1st Cir. 2007); see also United States v. Rivera-Rosario, 300 F.3d 1, 11 (1st Cir. 2002) ("[W]e are routinely required to review the entire record of the proceedings below before deciding whether the evidence is sufficient . . . ; we do not simply read the record until we have identified sufficient evidence and then stop reading at that point.").

16

decision under review, "some degree of intellectual rigor is required," and "a reviewing court should not give credence to 'evidentiary interpretations and illations that are unreasonable, insupportable, or overly speculative.'" Leftwich v. Maloney, 532 F.3d 20, 23 (1st Cir. 2008) (quoting United States v. Spinney, 65 F.3d 231, 234 (1st Cir. 1995)).

At his bond hearing before the IJ, Timbigamba submitted a sworn declaration describing Advocates' requirement that, before a new check could be disbursed to a resident or for expenditures made on the resident's behalf, the Finance Department required physical receipts documenting exactly how funds from the immediately prior check were spent. Timbigamba swore under oath that he complied with this receipt requirement for each of the seven checks at issue, that the expenditures were approved each time, and that all funds from those checks were spent on items or bills for the resident to whom they pertained. Welsch's declaration corroborated Timbigamba's description of Advocates' receipt requirement and underscored that this requirement made it such that diversion of a resident's checks over an extended period would be virtually impossible.

The government provided no evidence rebutting Timbigamba's evidence. Indeed, the police reports (which were all the government relied upon) make no mention of the receipt-submission requirement, and there is no indication that the Risk Management Director or Detective Wilson investigated whether Timbigamba submitted receipts documenting his purchases. While the Director and the Detective certainly alleged that Timbigamba picked up the resident's checks and

deposited or cashed them himself, Timbigamba and Welsch both explain—without contradiction—that this was standard practice for residents who were unable to handle money or conduct financial transactions. Indeed, the police report upon which the government relied describes statements from other employees of Advocates' Risk Management Department that Program Managers like Timbigamba are "tasked with overseeing [residents'] finances," "assisting [them] with paying . . . bills," and "purchasing any necessities or goods that [residents] would like to purchase." Doc. no. 8-4 at 10.

"Generally, a [factfinder] may not reject testimony that is uncontradicted and unimpeached . . . ." Quintana-Ruiz v. Hyundai Motor Corp., 303 F.3d 62, 75 (1st Cir. 2002). To be sure, lack of credibility may provide a basis to disregard otherwise uncontradicted evidence—but "[t]here must . . . be some affirmative evidence in the record to put the witness's credibility in doubt." Id. at 76. Although Timbigamba's declaration must be considered alongside the reality that he "quite obviously had a personal interest in the outcome of the case," id., there is no affirmative evidence in the record putting Welsch's credibility at issue despite the fact that she considered Timbigamba a friend, see doc. no. 8-3 at 13; see also Quintana-Ruiz, 303 F.3d at 76 (holding that "the fact that the witness was an employee of the defendant was not a sufficient basis for the jury to reject his [uncontradicted] testimony").

The IJ failed to explain the evidentiary significance she ascribed to Timbigamba's unrebutted exculpatory evidence or the analytical process by which she discounted it. While an IJ "need not discuss ad nauseam every piece of

evidence," the "IJ may not simply ignore substantial testimonial and documentary proof." Barnica-Lopez v. Garland, 59 F.4th 520, 530 (1st Cir. 2023) (quoting Pan v. Gonzales, 489 F.3d 80, 87 (1st Cir. 2007)). To the contrary, an IJ must "give[ ] reasoned consideration to the evidence as a whole, ma[k]e supportable findings, and adequately explain[ ] its reasoning." Id. (quoting Pan, 489 F.3d at 87). Although the IJ said she "reviewed the record carefully and considered all parties," she justified her dangerousness finding without mention of Timbigamba's or Welsch's declarations. The IJ failed to demonstrate reasoned consideration of this crucial exculpatory evidence, and the underpinnings by which she discounted it cannot be inferred from her reasoning on the record or the materials submitted at the hearing.

What is more, the IJ specifically anchored her dangerousness finding on the fact that Timbigamba "is currently under investigation for larceny" and had pending larceny charges, even though the charges were "not a conviction." But Timbigamba has substantial evidence exculpating him of these pending charges, and he has alleged that ICE refused to transport him to hearings in this criminal proceeding at which he could clear his name. Timbigamba's allegations (again uncontradicted by the government) reflect a troubling reality for many noncitizens like Timbigamba with pending criminal charges in ICE detention, and which courts and commentators have only just begun to meaningfully discuss.

Namely, ICE is often refusing to transport individuals in its custody to criminal court appearances (or to otherwise facilitate those individuals' appearances) only to then rely upon the charges ICE has caused to remain pending

19

as justification for the individuals' continued detention. See Tiffany J. Lieu, The Accountability Deficit: When Immigration Detention Obstructs One's Day in Criminal Court, 125 Colum. L. Rev. 1631, 1648-54 (2025) (identifying and discussing numerous examples of ICE's failure to produce detainees for criminal proceedings); Doe v. DHS, Civ. No. 3:24-259, 2025 WL 360534, at *2 (W.D. Pa. Jan. 31, 2025) (addressing constitutionality of alleged ICE policy "of refusing to permit non-citizens detained in [Moshannon Valley Detention Center] access to New Jersey state [criminal] court proceedings via video-conferencing technology or telephone" despite availability of "the technology [needed] for criminal hearings to take place at" the detention center). Because an IJ may consider an individual's criminal record (including pending charges) in granting or denying bond, see In re Guerra, 24 I. & N. Dec. 37, 40-41 (BIA 2006), abrogated in part on other grounds by Hernandez Lara, 10 F.4th at 41, "a noncitizen defendant who suffers obstruction of court access because of immigration detention may be forced to remain in immigration detention precisely because of that detention," Lieu, supra, at 1674. As the Western District of Pennsylvania recently recognized, when ICE denies detained noncitizens access to their criminal proceedings, it prevents them "from challenging evidence brought against them and establishing their innocence," in addition to causing myriad additional deprivations of constitutional rights noncitizens are entitled to in connection with their criminal proceedings (such as the rights to counsel and confrontation). Doe, 2025 WL 360534, at *4. The result is a Kafkaesque spiral: "the very detention that obstructs the criminal process

perpetuates that detention, which in turn perpetuates the obstruction of criminal process, and so on." Lieu, supra, at 1638.

In this case, the IJ failed to demonstrate that she gave any consideration to Timbigamba's allegation that ICE has refused to facilitate his appearance in court to face and be exonerated from his pending charges. In other words, without explanation, the IJ ascribed evidentiary significance to pending criminal charges where the entity relying upon the pendency of those charges to meet its burden of proof is the same entity that has prevented Timbigamba from establishing his innocence of those charges.

All told, the evidence of dangerousness presented to the IJ amounted to police reports documenting a materially incomplete larceny investigation that resulted in charges Timbigamba had a powerful defense to and which, but for ICE's refusal to bring him to court, he may well have been exonerated of by the time of the bond hearing. The IJ also had evidence before her that Timbigamba had no prior criminal record, that he had received no disciplinary infractions during his nine-plus months in custody, that he is a Sunday School teacher and an active church member, and that at least three persons authored letters of support attesting to Timbigamba's good character. Even construing the evidence in the light most favorable to the IJ's decision, the court finds that the evidence available to the IJ was insufficient as a matter of law to establish, after reasoned consideration, that Timbigamba's release posed a danger to the community to a high degree of probability or reasonable

21

certainty. The IJ's dangerousness finding therefore violated Timbigamba's due process rights.

III.    The Evidence Was Legally Insufficient to Establish that Timbigamba's Release Posed a Risk of Flight That No Amount of Bond or Conditions of Release Could Sufficiently Ameliorate

In the alternative to her dangerousness finding, the IJ found by a preponderance of the evidence that Timbigamba is a flight risk that no amount of bond could ameliorate. While less demanding than the clear-and-convincing standard, "the preponderance standard is not toothless," and the party who bears the burden must "present[ ] reliable and specific evidence." United States v. Stimpson, 113 F.4th 350, 355 (3d Cir. 2024) (quoting United States v. Roman, 121 F.3d 136, 141 (3d Cir. 1997)); see also Guerra, 24 I. & N. Dec. at 40-41 (holding that an IJ's bond decision must be based upon evidence in the record that is "probative and specific"). In the civil immigration context, the government's burden of demonstrating flight risk is no less weighty than its burden of demonstrating that a criminal defendant should be detained pretrial on the basis of flight risk. Hernandez-Lara, 10 F.4th at 40.

Timbigamba presented evidence to the IJ that: (1) he owns a home in Athol, Massachusetts, with an active mortgage that he was current on; (2) at the time of his arrest, he was enrolled in a master's degree program at Framingham State University; (3) he is an active member of a local church, where he teaches Sunday School classes and regularly speaks at church services; (4) he has no prior criminal record in the United States or elsewhere; (5) he has no disciplinary infractions while

22

in custody; (6) a U.S. citizen who knows him well was willing to sponsor his release on bond and pledged to ensure he attended all court hearings as required; and (7) additional community members authored letters attesting to Timbigamba's good character. The government argued that Timbigamba posed a flight risk because he has been ordered removed, and dismissed Timbigamba's evidence of community ties as "not . . . significant."

The IJ found that Timbigamba's release posed an unacceptable risk of flight "primarily" because he is subject to a non-final order of removal. However, a non-final "order of removal is not, by itself, sufficient to deny bond." Sales v. Johnson, 323 F. Supp. 3d 1131, 1141 (N.D. Cal. 2017). To the contrary, the INA specifically provides that the existence of an order of removal compels denial of bond only once that order becomes "administratively final." 8 U.S.C. §§ 1231(a)(1)(B)(i), (2)(A); see also 8 C.F.R. § 1241.1 (specifying circumstances in which "[a]n order of removal made by the [IJ] at the conclusion of proceedings under [8 U.S.C. § 1229a] shall become final"). Permitting denial of bond based on the mere fact of a non-final removal order would be in conflict with Congress's decision to mandate detention for noncitizens with orders of removal only once those orders become final. Where an IJ has discretion to consider a noncitizen's release on bond, the IJ must exercise that discretion in an individualized fashion based on the noncitizen's specific circumstances, not merely the procedural posture of their removal proceedings. See Guerra, 24 I. & N. Dec. at 40 (listing factors to be considered); see also 8 C.F.R. 1003.19(d) ("Consideration by the Immigration Judge of an application

23

. . . regarding custody or bond . . . shall be separate from and apart from, and shall form no part of, any deportation or removal hearing or proceeding.").

The IJ stated that she considered Timbigamba's ties to his church, his home ownership, and his degree program, but nevertheless found that he "has limited ties to the community" because he came to the United States "relatively recently" in 2022. But immigration authorities had released Timbigamba in 2022 after he had been in the United States for only a few weeks. In granting Timbigamba humanitarian parole under 8 U.S.C. § 1182(d)(5)(A) in 2022 and allowing him to enter the country, DHS necessarily determined that Timbigamba "present[s] neither a security risk nor a risk of absconding." 8 C.F.R. § 212.5(b); see also Kirboga v. LaRose, 819 F. Supp. 3d 1137, 1153-54 (S.D. Cal. 2025) (explaining that release on humanitarian parole "reflects a determination by the government that the noncitizen is not a danger to the community or a flight risk" (quoting Saravia v. Sessions, 280 F. Supp. 3d 1168, 1176 (N.D. Cal. 2017))). Since the time of DHS's determination, Timbigamba's ties to the United States have deepened. Where Timbigamba's newfound circumstances have only reinforced the accuracy of DHS's 2022 determination that he posed no flight risk, denying Timbigamba's release four years later on the basis of a flight risk finding absent a material change in circumstances is "so arbitrary that it . . . offend[s] fundamental tenets of due process." Hernandez-Azuaje v. Hyde, Civ. No. 25-CV-13224-ADB, 2026 WL 221833, at *1 (D. Mass. Jan. 28, 2026) (quoting Diaz Ortiz, 384 F. Supp. 3d at 144); see also Y.S.G. v. Andrews, No. 2:25-cv-1884-SCR, 2025 WL 2979309, at *10 (E.D. Cal. Oct.

24

22, 2025) ("Petitioner was previously released pursuant to a finding that he was not at risk of fleeing or harming others, and as such, due process prevents him from being redetained except upon a showing of a material change in circumstances." (quotation omitted)).

While acknowledging Timbigamba possessed what she deemed "limited" ties to the community, the IJ stated that those ties were outweighed by the fact "that he simply seems to have no viable option for relief and has already been ordered removed." Separate and apart from the mere fact of a non-final removal order (which is insufficient on its own to find flight risk for the reasons discussed above), BIA precedent permits IJs to consider the likelihood that a noncitizen might obtain relief from removal in assessing the noncitizen's risk of absconding from future proceedings. In re Andrade, 19 I. & N. Dec. 488, 491 (BIA 1987). However, if the IJ "makes 'an unambiguous misstatement of law' in describing the petitioner's prospects of avoiding removal, this legal error may fatally infect a flight risk determination." Kharis v. Sessions, No. 18-cv-04800-JST, 2018 WL 5809432, at *9 (N.D. Cal. Nov. 6, 2018) (quoting Zabaleta v. Decker, No. 18-CV-1802 (JGK), 2018 WL 4473340, at *4 (S.D.N.Y. Sept. 17, 2018)). In this case, the IJ failed to articulate the basis for her conclusion that Timbigamba had no viable path to obtain relief from removal, nor is her reasoning clear from the record.

Federal courts have begun to recognize "mounting evidence that bond determination hearings conducted in Immigration Court . . . have preordained outcomes." Singh v. Valdez, No. 1:26-cv-1109-WJM, at *10-11 (D. Colo. Apr. 1, 2026)

(doc. no. 11). "IJs often cite little or no reasoning in determining that noncitizens are a flight-risk," which frustrates federal courts from exercising what little authority they have to review bond determinations, and "effectively allow[s] the Government to transform an unlawful detention into a lawful one through post-hoc justifications." Id. (quoting Zheng v. Rokosky, --- F. Supp. 3d ----, ---- 2026 WL 800203, at *11 (D.N.J. 2026)). Against this reality, courts have held that an IJ's flight-risk determination unsupported by any attempt at reasoned justification violates the noncitizen's due process rights. See, e.g., Zheng, --- F. Supp. 3d at ----, 2026 WL 800203, at *8; Miri v. Bondi, No. 5:26-cv-00698-MEMF-MAR, 2026 WL 622302, at *9 (C.D. Cal. Mar. 5, 2026) (bond denial violated due process where the IJ "did not explain the reasons for denying . . . bond and the record does not establish that the Immigration Judge relied on the appropriate factors"); Rodriguez v. Greene, No. 4:26-cv-0333, 2026 WL 574961, at *12 (N.D. Ohio Mar. 2, 2026) (bond denial violated due process where IJ found flight risk "without supplying any reasoning how the IJ came to such a conclusion").

All told, the IJ denied Timbigamba bond on the basis of a flight risk finding despite DHS's determination in 2022 that he posed no flight risk. Timbigamba's ties to the community have only grown since 2022, having purchased a home, enrolled in an advanced degree program, and joined a faith community. There was no evidence before the IJ that he had ever failed to appear for any hearings in connection with his removal proceedings or any other proceedings. The fact of Timbigamba's non-final removal order is insufficient as a matter of law to establish

26

his flight risk, and the IJ failed to demonstrate reasoned consideration in support of her determination that he was unlikely to obtain relief from removal. Viewing the evidence and bond proceeding as a whole—and especially keeping in mind that the evidence needed to find flight risk in the immigration detention context must be at least as weighty as the evidence needed in the pretrial criminal detention context—the evidence was insufficient as a matter of law to justify Timbigamba's detention on grounds of flight risk, and the IJ's finding violated Timbigamba's due process rights.

IV.    Remedy

Having found that the bond hearing violated both Timbigamba's constitutional rights and this court's order granting his habeas petition, the question becomes one of remedy. Timbigamba—who has now been incarcerated for over ten months—seeks immediate release. Many courts have ordered such relief in similar circumstances. See, e.g., Zheng, --- F. Supp. 3d at ----, 2026 WL 800203, at *10-11 (ordering immediate release where petitioner had already been detained for five months without a bond hearing and, after the court ordered respondents to provide a bond hearing, the IJ denied bond based on legally insufficient evidence in violation of petitioner's due process rights); España v. Nessinger, No. 26-cv-014-JJM-PAS, 2026 WL 821788, at *13 (D.R.I. Mar. 25, 2026) (similar). The government's objection fails to address the appropriate remedy.

Historically, "common-law habeas corpus was, above all, an adaptable remedy," whose "precise application and scope changed depending upon the

circumstances." Boumediene v. Bush, 553 U.S. 723, 779 (2008). The writ's "most extensive" role at common law was "in cases of pretrial and noncriminal detention, where there had been little or no previous judicial review of the cause for detention." Id. at 780. In Boumediene, the Supreme Court made clear that, "when the judicial power to issue habeas corpus properly is invoked the judicial officer must have adequate authority . . . to formulate and issue appropriate orders for relief, including, if necessary, an order directing the prisoner's release." Id. at 787. At the same time, the court's authority to issue relief in habeas proceedings is not unlimited. Flores-Powell v. Chadbourne, 677 F. Supp. 2d 455, 474 (D. Mass. 2010). "Rather, the remedy should be tailored to the injury suffered and should not unnecessarily infringe on competing interests." Id. (ellipsis omitted) (quoting Ferrara v. United States, 384 F. Supp. 2d 384, 434 (D. Mass. 2005)).

In this case, the court's original order required the government to provide Timbigamba a constitutionally adequate bond hearing before an IJ. The government failed to provide Timbigamba with that relief. As the court has provided the government with an opportunity to carry its burden of justifying Timbigamba's detention and the facts elicited at the hearing demonstrate as a matter of law that Timbigamba is neither a danger nor a flight risk, it would be inequitable and a waste of resources to grant further relief in the form of an additional bond hearing—either before this court or an IJ. See id. at 477 (concluding that petitioner's detention had become unreasonably prolonged under 8 U.S.C. § 1226(c) but that, since the statutory justification for a noncitizen's detention does

28

not revert to § 1226(a) after becoming unreasonably prolonged, the court could order relief in the form of a bond hearing before an Article III judge); cf. Burks v. United States, 437 U.S. 1, 11 (1978) (explaining that retrial after criminal charges are reversed for legally insufficient evidence violates double jeopardy).

For these reasons—and based on the unique facts of this case and the government's failure to respond to Timbigamba's argument regarding the proper remedy—the court concludes that an order directing Timbigamba's immediate release under reasonable conditions of supervision is the appropriate measure to enforce its order granting the habeas petition.

## CONCLUSION

Timbigamba's motion to enforce (doc. no. 8) is granted. Respondents are ordered to release Timbigamba under reasonable conditions of supervision within twenty-four hours. Respondents shall file a status report confirming their compliance with this order within twenty-four hours of Timbigamba's release.

SO ORDERED.

_____
Landya McCafferty
United States District Judge

May 26, 2026

cc:    Counsel of Record

29